UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SCHILDER DAIRY, LLC, An Idaho Limited Liability Company,<br><br>    Plaintiff,<br><br>  v.<br><br>DELAVAL, INC., a Delaware Corporation,<br><br>    Defendant. | Case No. CV 09-531-REB<br><br>**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION IN LIMINE TO EXCLUDE OPINIONS AND TESTIMONY OF MARTIN R. LEE, D.V.M.**<br><br>(Docket No. 30) |

    Currently pending before the Court is Defendant DeLaval, Inc.'s ("DeLaval") Motion in Limine to Exclude Opinions and Testimony of Martin R. Lee, D.V.M. (Docket No. 30). Having carefully reviewed the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

### I. BACKGROUND

    Plaintiff Schilder Dairy, LLC ("Schilder") owns and operates two dairies – one in Buhl, Idaho; the other in Castleford, Idaho. *See* Pl.'s Compl. at ¶ 5 (Docket No. 1, Att. 3). Schilder contracted with DeLaval "to design, build, equip, monitor, inspect, and maintain a dairy barn and milking system . . . at the Buhl Dairy." *See id*. at ¶ 7. Schilder alleges that, beginning in February 2008, and continuing through 2009, its Buhl Dairy experienced a mastitis outbreak as indicated by higher-than-normal Somatic Cell Count ("SCC") measurements. *See id*. at ¶¶ 23-28. Schilder's designated expert, Martin R. Lee, believes that the mastitis outbreak at the Buhl Dairy was the result of the milking system's inability to maintain stable vacuum levels, based on

**MEMORANDUM DECISION AND ORDER - 1**

the Effective Reserve[1] of the milking system's South Vacuum Pump. *See* 5/23/11 Lee Aff. at ¶ 19 (Docket No. 35, Att. 4) ("[The Buhl Dairy's] inadequate effective reserve measurements indicated unsafe milking conditions . . . ."). Mr. Lee attributes this condition to DeLaval's inadequate maintenance, stating in no uncertain terms:

> [T]he failure of DeLaval Direct Distributing to perform Effective Reserve air flow measurements on a regular basis and the failure of the same company to inspect the inline check valves and the failure to replace the black flappers in those valves as needed is the primary cause of the precipitous decline in udder health and consequent rapid rise in herd SCC levels which began sometime in February 2008.
>
> . . . .
>
> From observation of these flapper valves, it is clear they had not been checked for a significant period of time which led to their failure and the near complete failure of the system with resulting detrimental effects on udder health for the entire heard.
>
> . . . .
>
> Had DeLaval Direct Distributing performed their system maintenance checks properly with attention of critical control points in the system such as the PVC check valves and the regular measurement of Effective Reserve, the mastitis problem on this dairy could have been mostly avoided.

*See* 4/8/09 Rpt. at pp. 37, 41-42 (Docket No. 13, Att. 1).

Arguing that Mr. "Lee's opinions concerning DeLaval's alleged equipment failures are unreliable", DeLaval now moves to exclude these opinions from evidence at trial. *See*

---

[1] According to Mr. Lee, "[t]esting Effective Reserve is a recognized, peer reviewed and well established procedure in the dairy industry for determining the fitness of a milking system to properly and safely milk cows." *See* 5/23/11 Lee Aff. at ¶ 17 (Docket No. 35, Att. 4). Mr. Lee further contends that "[t]he admission of too much air into a milking system is also a generally accepted, peer-reviewed explanation for insufficient effective reserve and vacuum fluctuations. *See id.* at ¶ 18.

**MEMORANDUM DECISION AND ORDER - 2**

DeLaval's Mem. in Supp. of Mot. to Exclude, p. 2 (Docket No. 30, Att. 1). Specifically, DeLaval contends that Mr. Lee based his opinions upon measurements he performed nearly four months *after* the alleged mastitis outbreak began and, from there, sought to work backwards in time to develop a theoretical mechanical problem particular to DeLaval's equipment to explain the recorded vacuum levels from January 2008 through the date of this later test, April 28, 2008, and beyond. *See id.* Additionally, according to DeLaval, Mr. Lee first associated Buhl Dairy's insufficient vacuum levels and related increase in mastitis levels with a broken "flapper valve" device in the PVC vacuum line of the North Vacuum Pump. *See id.* at p. 3. However, DeLaval points out that Mr. Lee's subsequent testings to remove the flapper valve from the system entirely had almost no effect on the Buhl Dairy's vacuum levels. *See id.* In turn, Mr. Lee was forced "to speculate, <u>without</u> conducting any testing, that a further failure condition must have occurred in the "butterfly valve" for the North Vacuum Pump, which allowed enough air to infiltrate the system and disrupt vacuum levels." *See id.* at pp. 3 & 14 (emphasis in original).[2]

With all this in mind, DeLaval dismisses Mr. Lee's analysis as "layers [of] speculation upon speculation in order to arrive at what appears to be the predetermined destination of DeLaval's fault." *See id.* at p. 14. According to DeLaval, Mr. Lee's opinions are not grounded in any replicable scientific methodology, such that his findings and corresponding evolution of theories of causation following one day of testing cannot logically extend to (and therefore

---

[2] Reaching this second conclusion particular to the butterfly valve necessarily assumes that the butterfly valve was repaired after April 28, 2008, given Mr. Lee's subsequent improved vacuum level findings once the flapper valve was removed. *See* DeLaval's Mem. in Supp. of Mot. to Exclude, p. 14 (Docket No. 30, Att. 1) ("But because measured CFM values actually showed improvement after the problematic readings Lee took on April 28, 2008, Lee is forced to *further* speculate that the subject "butterfly valve" must have been *repaired or replaced* – a proposition unsupported by any evidence.") (emphasis in original).

**MEMORANDUM DECISION AND ORDER - 3**

explain the condition at the Buhl Dairy over) the duration of the alleged mastitis outbreak. *See id*. at p. 15 ("These statements [in Mr. Lee's expert report] are not grounded in evidence or science; they are literally guesses. When Lee was deposed, he acknowledged that he did not examine the subject butterfly valve or conduct any investigation of it guided by scientific principles"). DeLaval therefore moves to exclude Mr. Lee's opinions as being unreliable.[3]

## II. DISCUSSION

### A. *Daubert*, FRE 702, and Bench Trials

Whether, and to what extent, Mr. Lee may testify at trial is addressed under the well-known standard first enunciated in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and its progeny, but now set forth in FRE 702. *See Alamar Ranch, LLC v. Boise Cnty.*, 2010 WL 5055917, *1 (D. Idaho 2010). If expert testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue," such testimony is admissible so long as "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *See* Fed. R. Evid. 702. The trial judge must perform a gatekeeping function to ensure that the expert's proffered testimony is both reliable and relevant. *See United States v. Freeman*, 498 F.3d 893, 901 (9th Cir. 2007). This gatekeeping function requires that the judge assess whether "the reasoning or methodology underlying the testimony is scientifically valid," and "whether that reasoning or methodology properly can be applied to the facts in issue." *See Daubert*, 509 U.S. at 592-93.

---

[3] DeLaval also takes issue with the timing of Mr. Lee's supplemental expert witness disclosure. *See* DeLaval's Mem. in Supp. of Mot. to Exclude, pp. 4, 17-20 (Docket No. 30, Att. 1). These issues were taken up by the Court during oral argument and, at that time, resolved pursuant to the parties' mutual agreement/understanding. The undersigned therefore considers the issue moot for the purpose of this Memorandum Decision and Order.

**MEMORANDUM DECISION AND ORDER - 4**

Although *Daubert's* reliability and relevancy requirements continue to apply in a bench trial (as is the case here), the customary concerns surrounding FRE 702's precautions in a jury setting – that of keeping unreliable expert testimony from the jury – are understandably not present in the bench trial. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010); *see also Att'y Gen. of Ok. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009) ("[W]hile *Daubert's* standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial."); *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004) ("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial."); *Traxys N. Am., LLC v. Concept Mining, Inc.*, 2011 WL 1979385, *1 (W.D.Va. 2011) ("The gatekeeping function of the court is relaxed where a bench trial is to be conducted . . . because the court is better equipped than a jury to weigh the probative value of expert evidence."); *LG Display Co. v. AU Optronics Corp.*, 265 F.R.D. 199, 202 (D. Del. 2010) (". . . *Daubert* considerations are less pressing in the context of a bench trial."). Nonetheless, while relaxed, the *Daubert* standards governing admissibility of expert testimony must still be met, even during a bench trial.

**B.     Mr. Lee's Opinions Will Not be Excluded as Unreliable Before Trial**

There is little question in the Court's mind that the overall thrust of Mr. Lee's opinions surrounding the mastitis outbreak at the Buhl Dairy centers upon the milking system's failure to maintain stable vacuum levels, as allegedly confirmed by Effective Reserve measurement(s). Even DeLaval does not seriously dispute the interrelation and importance of these factors when speaking to proper dairy stewardship. Instead, it is the way Mr. Lee interprets a lone data point at a single moment in time to explain the existence of conditions over an extended temporal

**MEMORANDUM DECISION AND ORDER - 5**

span, coupled with Mr. Lee's more pointed opinions as to the *reasons* for the alleged unstable vacuum levels that DeLaval disputes as "unscientific, unreliable, and unhelpful to the Court." *See* DeLaval's Reply Mem., p. 2 (Docket No. 47).

It is true that Mr. Lee appears to premise his conclusions upon his April 28, 2008 Effective Reserve testing, while criticizing DeLaval's overall inspection and maintenance practices at Schilder's Buhl Dairy – from failing to consistently test Effective Reserve, to not regularly inspecting and/or repairing the milking system's internal workings, including the flapper and butterfly valves. But these realities should not be considered in a vacuum. Mr. Lee's professional credentials are not at issue; nor is the import of Effective Reserve testing in monitoring and preventing mastitis occurrences. While it could simply be argued (and no doubt disputed by DeLaval) that repeatedly-low Effective Reserve measurements implicates DeLaval as the entity in charge of maintaining the milking system at the Buhl Dairy, Mr. Lee goes further in attempting to actually pinpoint the reasons contributing to those low measurements. Viewed in this light, Mr. Lee's educated opinions cannot be disregarded entirely. Still, even though the Court ultimately may be persuaded to agree with DeLaval's criticisms of Mr. Lee's (1) extrapolation of limited Effective Reserve data across the relevant multi-month time period, and (2) arguably cursory analysis concerning the flapper and butterfly valves' respective conditions during this same time, these concerns go to the weight, not the admissibility, of Mr. Lee's testimony.

Mr. Lee's opinions are clearly subject to challenge by DeLaval's counsel, especially with respect to the apparent absence of consistent Effective Reserve measurements over the time period presumed within Mr. Lee's expert report, the lack of any actual testing on the butterfly valve that Mr. Lee contends must have contributed to low vacuum levels, and the possibility of

alternate, non-mechanical factors that could also have led to the mastitis found at the Buhl Dairy. In short, any "'weakness in the underpinnings of [expert] opinions may be developed upon cross-examination,' as 'such weakness goes to the weight and credibility of the testimony'" as opposed to its admissibility. *See Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352, n.5 (9th Cir. 1987) (citing *Polk v. Ford Motor Co.*, 529 F.2d 259, 271 (8th Cir. 1976)); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Because it cannot be said that Mr. Lee's opinions are altogether unrealistic or contradictory, they will not be excluded before trial – particularly when understanding the procedural posture existing in a bench trial instead of a jury trial. Therefore, DeLaval's Motion is denied.

## III. ORDER

Based upon the foregoing, IT IS HEREBY ORDERED that DeLaval's Motion in Limine to Exclude Opinions and Testimony of Martin R. Lee, D.V.M. (Docket No. 30) is DENIED.

DATED: **July 5, 2011**

Honorable Ronald E. Bush
U. S. Magistrate Judge