SCHILDER DAIRY, LLC, An Idaho Limited
Liability Company,

                    Plaintiff,

          v.

DELAVAL, INC., a Delaware Corporation,

                    Defendant.

Case No.  CV 09-531-REB

**MEMORANDUM DECISION,
FINDINGS OF FACT, AND
CONCLUSIONS OF LAW**

## I.  <u>INTRODUCTION</u>[1]

        Plaintiff Schilder Dairy, LLC ("Schilder") owns and operates two dairies – one in Buhl,

Idaho (referred to herein as "Dairy No. 1"); the other in Castleford, Idaho (referred to herein as

"Dairy No. 2").  Schilder contracted with Defendant DeLaval, Inc. ("DeLaval") to design, build,

equip, monitor, inspect, and maintain a dairy barn and milking system at Dairy No. 1.  Schilder

alleges that, beginning in February 2008, and continuing through 2009, Dairy No. 1 experienced

a mastitis outbreak as indicated by higher-than-normal somatic cell count ("SCC")

measurements over a period of time.  Schilder attributes the mastitis outbreak at Dairy No. 1 to

the inability of its milking system to maintain consistently-stable vacuum levels, which allowed

the spread of mastitis pathogens among the cows being milked at the dairy.

        Schilder contends this condition arose from DeLaval's failure to adequately maintain

Dairy No. 1's milking system, further contending that it has suffered substantial financial loss as

_____

        [1]  To the extent any of the facts or conclusions stated in this introductory section can be
considered Findings of Fact and/or Conclusions of Law and are not restated in sections II or IV,
they are incorporated by reference into the relevant section(s) below.

**MEMORANDUM DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW - 1**

a result, in the form of reduced milk payments and increased herd expense. In seeking compensation for those damages, Schilder asserts six claims against DeLaval: (1) breach of express contract; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of the implied warranty of workmanlike performance; (4) breach of the implied warranty of merchantability; (5) breach of the implied warranty of fitness for a particular purpose; and (6) negligence. As the Plaintiff, Schilder's burden is to prove its claims, or any one or more of them, by a preponderance of the evidence.

DeLaval denies any liability for Schilder's alleged losses, and contests the allegations that either its equipment, or the maintenance of the equipment, caused the mastitis problems at Dairy No. 1. Specifically, DeLaval contends that the DeLaval-specific equipment comprising Dairy No. 1's milking system is not defective; that it properly maintained Dairy No. 1's milking system; and that any increase in SCC measurements at either of Schilder's dairies, and the related mastitis outbreak, are the result of Schilder's dairy practices, independent of DeLaval's equipment and/or service obligations.

A six-day bench trial began on July 6, 2011. During the trial, the following individuals testified: (1) John Schilder, (2) Todd Wells, (3) John "B.J." Schilder, (4) Sergio Estrada, (5) Jim Wathen, (6) Roger Sanderson, (7) Oren Devries, (8) Dr. Martin Lee, (9) David Bray, (10) Dr. James Reynolds, and (11) Dr. Terry Smith.

The case was well-tried, by counsel who were prepared and thoughtful advocates. As is often true for civil cases that come to trial, the issues and their economic consequences were important to both parties, and the parties were in significant disagreement about such matters. The Court has carefully considered the argument of counsel, the testimony of the witnesses, the exhibits admitted (including those containing studies and research in dairy science written by

dairy science experts, some of whom testified in this case), and has weighed and compared the particulars of such evidence. The Court finds substantial agreement in much of the evidence about the potential causes and manifestations of mastitis in a dairy herd, and the economic consequences of mastitis for the dairy owner. The Court also finds substantial agreement in much of the evidence about the importance of the proper operation of milking equipment, and the proper procedures to be followed in a milking parlor, in helping to control mastitis. However, around the edges of such common ground in the evidentiary record are very different views of how and why a mastitis outbreak occurred at Dairy No. 1. The Court must measure the evidence, as it has done here, to draw findings of fact and conclusions of law as to how the Court is persuaded, or not persuaded, by the evidence presented at trial, considered against the legal standards setting out the elements that Schilder must prove to succeed on its claims, and the burden of proof Schilder must meet. Those findings and conclusions follow in this decision.

## II.  <u>FINDINGS OF FACT</u>[2]

Having carefully considered the testimony of the witnesses called at trial,[3] thoroughly reviewed the exhibits admitted into evidence, and considered the parties' arguments, the Court makes and enters the following Findings of Fact pursuant to Federal Rule of Civil Procedure 52(a). All Findings of Fact referred to herein, unless otherwise qualified or limited, apply the preponderance of the evidence standard.

---

[2]  To the extent any of the facts stated in this section can be considered Conclusions of Law and are not restated in section IV, they are incorporated by reference into the relevant section below.

[3]  The Court generally finds the testimony of the witnesses at trial to be credible and sincere; an exception to that conclusion exists as to Mr. Estrada. Although a language barrier may have contributed to some level of difficulty for Mr. Estrada, on balance, his testimony regarding the maintenance of the milking system at Dairy No. 1 was inconsistent with other testimony and documentary evidence in the record.

To the extent the Court has concluded that any evidence in the record does not support certain claims or defenses made by the respective parties, it will not be included in these Findings of Fact or otherwise referenced. The failure to mention an event or series of events in these Findings of Fact is not an oversight or unintentional omission but rather an indication that the evidence does not support a finding and/or conclusion in favor of the claims alleged. *See White Indus., Inc. v. Cessna Aircraft Co.*, 845 F.2d 1497, 1499 (8th Cir. 1988) (Rule 52(a) does not require particularized findings on each piece of evidence parties present at trial). With these principles in mind, here follow the Court's Findings of Fact:

**A.     The Parties**

1.     Schilder is an Idaho limited liability company, having a business address of 1142 East 3700 North, Buhl, Idaho. Schilder is owned by Agnes Schilder, John Schilder, and John "B.J." Schilder.

2.     DeLaval is a Delaware corporation that markets and services dairy equipment. It has a business address of 11100 North Congress Avenue, Kansas City, Missouri 64153-1296. DeLaval operates a business in Idaho known as DeLaval Direct, originally located in Buhl, Idaho, and now located in Jerome, Idaho.

**B.     Jurisdiction and Venue**

1.     This Court has jurisdiction over the subject matter of this civil action based on diversity of citizenship, pursuant to 28 U.S.C. § 1332(a). The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

2.     Venue properly lies in this District, pursuant to 28 U.S.C. § 1391(a)(2) because it is the District in which a substantial part of the events giving rise to the claims occurred, or a substantial part of the property that is the subject of this action is situated.

**C.    Dairy No. 1 and the Milking System**

1.    Schilder operates two dairies.  Dairy No. 1 is located in Buhl, Idaho; Dairy No. 2 is located in Castleford, Idaho.

2.    In October 2005, John Schilder entered into a Purchase Agreement with DeLaval Direct for the purchase of certain dairy equipment (referred to herein as the "milking system"). This lawsuit relates to the milking system installed at Dairy No. 1; Dairy No. 2's dairy equipment is not at issue in this lawsuit.

3.    The October 2005 Purchase Agreement between John Schilder and DeLaval Direct provides in relevant part:

> The undersigned have read and agree to the TERMS AND CONDITIONS as well as the LIMITED WARRANTY of DeLaval Inc. On the reverse side of this Purchase Agreement.

4.    The "Limited Warranty" set forth on the reverse side of the October 2005 Purchase Agreement between John Schilder and DeLaval Direct provides in relevant part:

> Due to the wide variation in farm animals, management practices and other conditions beyond DeLaval's and Seller's control, no specific level of performance of the Equipment, or the system in which it is used, is guaranteed. . . . .
>
> Other than this Limited Warranty, . . . . **DELAVAL AND SELLER MAKE  NO OTHER WARRANTY FOR THE EQUIPMENT OR THE SYSTEM IN WHICH IT IS USED, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. . . . .**
>
> **THE REMEDIES SET OUT ABOVE ARE THE OWNERS' EXCLUSIVE REMEDIES FOR BREACH OF THIS LIMITED WARRANTY.  IN NO EVENT SHALL AN OWNER BE ENTITLED TO RECOVER DAMAGES OF ANY KIND, WHETHER DIRECT, INDIRECT OR CONSEQUENTIAL (INCLUDING BUT NOT LIMITED TO DAMAGES DUE TO**

**DELAYS IN DELIVERY, LOSS OF PRODUCTION, LOSS OF PROFIT, LOSS OF PREMIUMS, EXCESS CULLING, INCREASED COSTS OF OPERATION, AND LOSS OF, INJURY TO, OR ILLNESS OF LIVESTOCK) IN EXCESS OF THE PURCHASE PRICE REFUND REMEDY SET OUT ABOVE. . . . .**

The Owners have evaluated the risk of failure of the Equipment, and that risk is reflected in the price of the Equipment. It is the intention of the parties that their legal rights, remedies and liabilities be governed solely by the terms of this Limited Warranty. **IN CONSIDERATION OF THIS LIMITED WARRANTY AND THE REMEDIES SET OUT ABOVE, THE OWNERS WAIVE ANY AND ALL OTHER CLAIMS AND CAUSES OF ACTION AGAINST DELAVAL AND SELLER RELATING TO THE DESIGN, MANUFACTURE, SALES, INSTALLATION, USE OR OPERATION OF THE EQUIPMENT INCLUDING BUT NOT LIMITED TO CLAIMS FOR DAMAGES OF ANY KIND BASED ON BREACH OF CONTRACT, STRICT LIABILITY, PRODUCTS LIABILITY, NEGLIGENCE OR OTHER FAULT OF DELAVAL OR SELLER.**

5.      The milking system was installed at the time of the construction of the new dairy barn at Dairy No. 1 in 2006.

6.      The milking system includes, but is not limited to, two, 20 horsepower DeLaval lobe vacuum pumps. The two vacuum pumps – the north vacuum pump and the south vacuum pump – work alternate cycles (*i.e.*, the north pump operates for one milking, and the south pump operates at the next milking, and so forth) to provide the suction for the milking system, thus creating the vacuum required for milking cows at Dairy No. 1. Milking at Dairy No. 1 occurs three times a day.

7.      The vacuum pumps utilize a single exhaust and each pump is equipped with a metal butterfly valve on the exhaust.

**MEMORANDUM DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW - 6**

8.     When one vacuum pump is operating, the exhaust flow from that operating vacuum pump pushes open the butterfly valve for that operating vacuum pump; simultaneously, the butterfly valve for the non-operating vacuum pump is in the closed position, preventing the operating vacuum pump's exhaust from entering the milking system through the non-operating vacuum pump.

9.     After the original installation, PVC flapper valves were installed on both vacuum pumps.

10.    When one vacuum pump is operating, the flapper valve is pulled open by that vacuum pump's air flow.  The flapper valve closes by gravity when the milking system is not in use and is held closed by suction when the vacuum pump on that same side is not in use.

11.    The flapper valves are intended to operate as a redundant safeguard to the butterfly valves, preventing exhaust air from entering the milking system through the non-operating vacuum pump.

12.    Entry of exhaust air into the milking system through a non-operating vacuum pump causes unstable vacuum levels, which can inhibit the milking system's ability to maintain an "effective reserve" of vacuum.  That is, if excess air enters the milking system, effective reserve may decrease.

13.    After milking began at Dairy No. 1, DeLaval entered into a separate verbal contract with Schilder for the maintenance of the milking system, by which DeLaval agreed to perform various monthly maintenance work on the milking system.

14.    The verbal contract provided for no limitation on available remedies for breach of the contract.

15.     Primarily, Sergio Estrada and Roger Sanderson were the employees of DeLaval responsible for maintenance work related to the milking system, which was described as checking the flapper valves, cleaning the vacuum pumps, and measuring the milking system's effective reserve.

**D.     Mastitis, Staphylococcus aureus, SCC, and Effective Reserve**

1.     Mastitis is an inflammation of a cow's mammary glands and is caused by several different pathogens, including Staphylococcus aureus ("Staph aureus").

2.     Most dairies have Staph aureus-related mastitis present in the dairy herd at all times.

3.     At Dairy No. 1, a "bulk tank" receives all of the milk obtained from the cows in the milking parlor.  The bulk tank then holds the milk until it is removed to a milk tank truck to be delivered to the dairy's bulk milk customers.  From testing done of the milk in the bulk tank, there has been consistent evidence of the presence of Staph aureus at Dairy No. 1 since 2004.

4.     Mastitis can have observable (clinical) and non-observable (subclinical) symptoms.  Because subclinical mastitis symptoms are not observable, elevated SCC levels are one of the best indicators of subclinical mastitis.

5.     SCC reflects the number of white blood cells (somatic cells) present in milk.  An increase in the SCC for an individual cow may be evidence of infection in that cow's udder.

6.     SCC levels are expressed in terms of cells per milliliter ("CPM").

7.     If Schilder's milk contained low SCC levels (for instance, under 100,000 CPM), Schilder received a higher price for its milk from its bulk milk purchasers.

8.      SCC levels were obtained for Schilder in two ways: (1) Schilder employed an independent contractor, Treasure Valley Testing (subsequently known as High Desert Dairy Testing), to test each cow individually and provide a herd average once per month; and (2) it received an SCC reading for the bulk tank (an average of the cows contributing milk to the bulk tank) from the purchasers of its milk.

9.      Effective reserve is an important measure of a milking system's ability to maintain stable vacuum levels; adequate effective reserve is the essential factor to keeping stable vacuum levels during milking.

10.     An effective reserve of at least 95 CFM is needed to effectively run the milking system at Dairy No. 1.

11.     Failure to maintain stable vacuum levels can injure a cow's teats and can create conditions conducive for the infection of the cow with mastitis-causing pathogens.

**E.      Dairy No. 1 Experiences a Rise in Mastitis in Late 2007 and a Mastitis Outbreak in Early 2008**

1.      From October 2007 to November 2007, Dairy No. 1's SCC levels rose significantly.

2.      In late November 2007, Dr. Martin Lee, a veterinarian and dairy operation consultant hired by Schilder, visited Dairy No. 1.

3.      Dr. Lee's November 27, 2007 report noted:

        a.      "[A] very bad buildup of milk solids in the bottom of the Receiver" which "could be a significant contributor to the current increase in mastitis incidence in the herd."

b.  "About 50% of the cows show excessive teat end hyperkeratosis and 20% could be classified as very rough.  Both of these parameters are well above accepted industry standards which would suggest that excessive hyperkeratosis should be less than 20% and those classified as very rough should be less than 5%.  There is some association with teat end hyperkeratosis and eversions with increased levels of mastitis."

c.  Teat end damage is caused, in part, by:

   i.  "[L]ow system vacuum";

   ii.  "[E]xcessive machine 'on-time' because milkers do not remove the machines as soon as possible after milk flow has ceased";

   iii.  "[D]elayed milk letdown which is evident on most cows.  When delayed milk letdown is encountered it is usually because the cows do not see the same udder stimulation from all milkers and they don't know what to expect.  Therefore, they do not letdown until the machine is attached.  That time period in which the inflation is working on a dry or mostly dry teat end without the lubricating effect of milk causes excessive callus buildup on the teat ends, that is, hyperkeratosis."; and

   iv.  The possibility that certain milkers on certain shifts do not adequately employ a "consistent routine with vigorous teat massage which should result in adequate oxytocin release."

  d.  "Many machines retract too rapidly which does not allow adequate time for vacuum decay. The result is machines removed under vacuum which does two things: First, this causes reverse impacts on the teat ends and will contribute to mastitis. Secondly, this causes teat end eversions."

  e.  "[V]acuum stability during normal milking is very good . . . ."

  f.  "Both flapper valves are cracked and need to be replaced."

  g.  "When milkers lay out the towels in the center of the pit, these towels can become badly contaminated with splattered manure, urine, and water. This will contribute to mastitis."

  h.  North vacuum pump's effective reserve at 151 CFM.

  I.  South vacuum pump's effective reserve at 144 CFM.

4.  In December 2007, Dr. Lee performed a follow-up visit to Dairy No. 1.

5.  Dr. Lee's December 12, 2007 report noted:

  a.  "Elevated SCC following raising vacuum levels . . . . due to improved milk-out and the removal of residual somatic cells in the udder." Dr. Lee predicted that "the SCC should return to acceptable levels within the next two weeks."

  b.  Acceptable teat end vacuum stability.

6.  In early 2008, Dairy No. 1 experienced an apparent subclinical mastitis outbreak as Dairy No. 1's SCC levels dramatically rose in February 2008, March 2008, and April 2008.

7.  In late April 2008, at Schilder's request, Dr. Lee visited Dairy No. 1 to determine the cause of its increased SCC levels.

8.      Dr. Lee's April 28, 2008 report noted:

a.      "Effective Reserve of both vacuum pumps reflects a decline in capacity
since first measured in November, 2007.  At that time, Calculated True
Effective Reserve for the North Vacuum Pump was 151 CFM.  Now that
same pump measures only 129 CFM.  The South Vacuum Pump in
November was 144 CFM and now is 55 CFM!  This decline is very
dangerous to udder health because the system cannot maintain stable
vacuum levels during milking."

b.      "Both check valves have cracked flappers and the valve for the North
pump has a very large hole which causes a substantial air leak when the
South Vacuum Pump operates.  The appearance of this hole indicates it
has been faulty for a long time.  Both flappers were noted to have cracks
in the report dated 11-27-07 and replacement was recommended.  This
type of check valve needs to be inspected frequently and flappers usually
need replacement every three to four months."

c.      "Because Effective Reserve is marginal in this barn, even minor leaks can
result in reduced vacuum stability during milking.  Therefore, in addition
to frequent inspection and replacement of the flapper valves, the gasket on
the Receiver lid needs to be replaced or repositioned to correct an air leak
at this location."

d.      "As noted in the report dated 11-27-07, there is still a buildup of milk
solids in the bottom of the Receiver.  In addition, there are obvious milk

solids present on the claw windows of most machines. This buildup allows the growth of bacteria in the system which can be a direct cause of mastitis."

e. "As noted previously in this report and in the report of 11-27-07, Effective Reserve is marginal for this barn. However, your milkers are careful about correction of squawks and fall-offs so that vacuum stability during normal milking is very good. That said, there is little room for error and if the flapper valves were not replaced following the November visit, then it is likely that raising the vacuum to 12 inches resulted in increased leakage through the cracks in the flappers and, therefore, caused unacceptable vacuum fluctuation resulting in the increase in clinical cases and herd SCC levels."

f. "There is also cause for concern if milkers working during the night shifts when no one is watching, are not as careful about correction of liner slips and kick-offs. Then there is likely to be inadequate Effective Reserve to maintain acceptable vacuum stability."

g. "Milkers must not use the same towel on more than one cow"

h. "Post milking teat spray coverage is very poor, particularly on front teats and milkers need to be more conscientious to be sure all teats are adequately covered."

i. "Some milkers remove machines before the cows are finished milking."

9.      Dr. Lee tested the south vacuum pump's effective reserve at least twice during his April 2008 visit.

10.      For the south vacuum pump to register an effective reserve of 55 CFM, exhaust would have to be flowing backward through the north vacuum pump at a rate of 145 CFM.

11.      During Dr. Lee's April 2008 visit to Dairy No. 1, he did not inspect the milking system's butterfly valves.

12.      At Dr. Lee's direction, Schilder stopped using the south vacuum pump until the damaged north flapper valve was replaced; BJ Schilder soon thereafter obtained and installed a replacement north flapper valve.

13.      Following the replacement of the north flapper valve, Schilder, at Dr. Lee's direction, cultured the entire herd at Dairy No. 1 for Staph aureus in May 2008 and determined that 464 of its cows had Staph aureus.

14.      Dairy No. 1 experienced a rise in mastitis in late 2007 and a mastitis outbreak in early 2008.

**F.      Dairy No. 1's Milking System's Effective Reserve Was Sufficient in September 2008 and February 2009**

1.      At DeLaval's request, Dr. Lee and Dr. Allan Britten of Udder Health Systems, Inc., visited Dairy No. 1 in September 2008 and February 2009 to re-test the milking system's effective reserve.

2.      During the milking system's re-testing in September 2008 and February 2009, the milking system's effective reserve was tested – both with and without the flapper valves installed.

3.     At that time, the milking system's effective reserve was sufficient; moreover, the removal of the flapper valves from the milking system did not make an appreciable difference in terms of the milking system's effective reserve.

### III.  DISCUSSION[4]

There is no dispute that Schilder's Dairy No. 1 experienced a mastitis outbreak in early 2008.  However, the *cause* of that mastitis outbreak represents the lynchpin liability issue in this case.

Schilder maintains that the timing of the mastitis outbreak corresponds temporally with the low effective reserve calculations in April 2008.  According to Schilder, the low effective reserve calculation in April 2008 – specifically for the south vacuum pump – is a function of the north vacuum pump's inability to prevent the exhaust from the south vacuum pump from entering the vacuum system, thus compromising the milking system's ability to maintain proper vacuum levels for milking.  Contrasted against the effective reserve measurements taken in September 2008 and February 2009 at Dairy No. 1, Dr. Lee opines that, during the April 2008 visit, the butterfly valve for the north vacuum pump must have been non-functional (stuck open), allowing the operating south vacuum pump's exhaust to flow through the north vacuum pump and into the milking system through the hole in the damaged north flapper valve.  Relatedly, then, Dr. Lee believes that the milking system's butterfly valves were properly functioning during the subsequent September 2008 and February 2009 visits.

Therefore, through Dr. Lee, Schilder's theory of liability against DeLaval rests upon the otherwise unconfirmed proposition that, although the milking system's butterfly valves were

---

[4]  To the extent any of the facts or conclusions stated in this discussion section can be considered Findings of Fact and/or Conclusions of Law and are not restated in sections II or IV, they are incorporated by reference into the relevant section(s) herein.

functioning properly in September 2008 and February 2009 (and, presumably, continue to be functioning properly to this day), the north vacuum pump's butterfly valve was malfunctioning in April 2008 and for a period of time before then.  In turn, the malfunctioning north vacuum pump's butterfly valve, in conjunction with the hole in the redundant north flapper valve, resulted in the south vacuum pump's dangerously low effective reserve when measured in April 2008 and, consequently, the mastitis outbreak taking place over that same period of time.

This theory is plausible, particularly when understanding that a compromised north flapper valve existed in April 2008 and that such a condition theoretically arises when the corresponding butterfly valve on the north vacuum pump is not consistently operating as it should.  Still, the fact that a theory of liability is possible does not necessarily make it probable under the requisite evidentiary standard, as must be the case for Schilder to prevail here.

In the Court's mind, the April 2008 "snapshot" of the milking system is just that – an exceedingly limited picture of Dairy No. 1's situation, applicable only to that specific point in time.  Unless Schilder is able to show by a preponderance of the evidence that the condition of the milking system as of late April 2008 also existed prior to that time, Schilder cannot reasonably prove that DeLaval's milking system and/or maintenance practices caused, or substantially contributed to, the mastitis outbreak resulting in Schilder's alleged damages.  For the following reasons, the Court finds that Schilder cannot make such a showing.

1.      Dr. Lee admits that his theory surrounding the allegedly malfunctioning north butterfly valve is untested and hypothetical, testifying that he "speculates" that, over time, a milking system's vacuum pumps accumulate aerosolized milk and soap residues that come into contact with and, unless properly cleaned, impair the butterfly valves' operating mechanisms.

Yet, beyond this speculation, Dr. Lee does not know what caused the alleged failure of the north butterfly valve or when it occurred. He never examined the north butterfly valve on or before April 2008 to confirm his theory; he did no testing to determine either the amount of residue needed to cause a butterfly valve to stick and remain open despite 145 CFM of hot exhaust blowing in the opposite direction up to two times a day, or whether the north butterfly valve ever actually experienced such conditions; and he performed no tests to determine the effect, if any, of flushing the vacuum pumps with water and detergent on the butterfly valves.

Moreover, in light of the September 2008 and February 2009 effective reserve readings, Dr. Lee reasoned that the north butterfly valve became functional as of those later dates. Addressing this reality in an April 8, 2009 report, Dr. Lee theorized that "[i]t would be reasonable to expect that when DeLaval Direct came to the dairy to replace the failed flappers or at some other time they were there for service, that the exhaust butterfly valves were examined and repaired or replaced so that they again became functional." Except, there is no testimony or evidence in the record that the north butterfly valve was *ever* replaced or repaired prior to trial. Instead, the record contains some testimony that the milking system's vacuum pumps were flushed monthly before April 2008. While conflicting testimony exists as to the ultimate utility of flushing the milking system's vacuum pumps vis à vis maintaining/cleaning its butterfly valves, there is no evidence in the record that DeLaval performed anything different by way of butterfly valve maintenance between April 2008 and September 2008. In other words, Dr. Lee's theory inescapably assumes that, some time after April 2008, the north butterfly valve somehow corrected itself as of September 2008 and, apparently, continues to adequately perform to this day.

Dr. Lee is, without question, an expert in his field – he is clearly knowledgeable about the inner workings of dairies and their respective milking systems. However, as described in these Findings of Fact and Conclusions of Law, Dr. Lee's theories are not always supported by evidence in the record and/or resistant to critique. Such is the case here with respect to his theory concerning the north butterfly valve's intermittent (in)ability to operate as designed.

2. Consistent with Schilder's theory of liability, for the south vacuum pump to register an effective reserve of 55 CFM, exhaust would have to be flowing backwards through the north vacuum pump at a rate of 145 CFM. Citing the testimony of DeLaval Direct's general manager, Jim Wathen, DeLaval argues that (1) such a phenomenon would result in a "very loud racket" – a "howling, screaming, rattling-type sound" – that would be heard throughout the barn, and (2) there is no evidence that anyone, including Dr. Lee, heard such a sound at Dairy No. 1 while the south vacuum pump was operating during the relevant time period. In response, Schilder argues that the referenced "howling" sound only occurs when a vacuum pump is cross-wired, running in reverse under power. According to Schilder, there is no evidence that the north vacuum pump was ever cross-wired to run backwards under power and, as a result, never would have made the sounds described by Mr. Wathen. Rather, Schilder asserts that airflow moving in the opposite direction through a non-operating vacuum pump would only have more-or-less silently spun the vacuum pump's motor – "like a pinwheel." The record is not altogether clear in this respect. Even so, while there is some dispute over what was (or, even, could have been) *heard* as 145 CFM of exhaust moved in reverse through the non-operating north vacuum pump, it is apparent that a north vacuum pump's motor, spinning backwards, could nonetheless be observed to be running backwards.

In that regard, Mr. Wathen testified that the flapper valves were originally installed on the milking system at Dairy No. 1 because "B.J. [Schilder] had noticed that the motor on the vacuum pump that wasn't running at any given time would spin backwards and he inquired about that." While the rotating motor suggested to Mr. Wathen only a small vacuum leak at that time, the flapper valves were subsequently attached as a back-up to the butterfly valves to further protect against vacuum leaks. Schilder does not dispute this fact – B.J. Schilder's own testimony confirms as much. The evidentiary significance of all this is that, if it is possible to see a non-operating vacuum pump's motor spin backwards due to a "small" vacuum leak, it is similarly possible (perhaps even more so) to observe a non-operating vacuum pump's motor spin backwards due to a more significant vacuum leak, such as the one Schilder alleges here. But there is no evidence in the record suggesting that anyone, including Dr. Lee, ever saw the north vacuum pump's motor spinning during the south vacuum pump's operation between November 2007 and April 2008.

3.      A vacuum pump, like the milking system's south vacuum pump, operating with an effective reserve of 55 CFM would have contributed to noticeable problems in the milking process if permitted to exist over time – e.g., slower milking times, dropped milking units, and excessive "squawking." However, despite the south vacuum pump operating up to two of the three milking times per day, and being inescapably subject to a direct contrast between its operation and output to that of the alternating north vacuum pump, nobody at Schilder ever observed or reported a problem with the south vacuum pump. If something was amiss in the way the south vacuum pump processed Dairy No. 1's volume of milk, Schilder, as a business, would have known about it. But it didn't – at the time, there was no connection between any

complaints from the milkers and the malfunctioning condition Schilder alleges to have existed with the north vacuum pump's butterfly valve and the north flapper valve during that same time.

Dr. Lee admits that milking speed generally has a linear relationship with system vacuum levels, but argues that low effective reserve, while potentially unsafe to milking cows, does not mean that system vacuum levels are continuously low. According to Dr. Lee, even with a low effective reserve, periods of time exist where vacuum levels are normal, followed by episodes of irregular vacuum fluctuations during machine attachments, liner slips, kickoffs and/or falloffs. Except, even though Dr. Lee measured vacuum fluctuations during earlier visits, he never measured vacuum fluctuations at Dairy No. 1 during the all-important April 2008 visit, let alone recorded irregular vacuum fluctuations. Therefore, while Dr. Lee may indeed be correct as to the possibly-limited interrelationship between low effective reserve measurements and system vacuum levels, he never actually tested this position at the most integral time – there is no evidence speaking to the milking system's vacuum fluctuations (good or bad) in April 2008. Therefore, his opinion in this respect raises just as many questions as it attempts to answer.

More fundamentally, even if Dr. Lee's opinion on vacuum fluctuations was accepted as true, it does not speak to a constant situation. The fact that discrete periods of time might exist where vacuum levels are normal cannot operate to ignore those instances where vacuum levels are not normal and negatively affect the milking process and the health of the milking cows. From the undersigned's perspective, Dr. Lee's theory represents a "perfect storm" of events needed to maintain consistent vacuum levels in the face of a low effective reserve. Absent evidence suggesting such a perfect storm to have been anchored in place over a lengthy period of time at Dairy No. 1 (and therefore explaining the south vacuum pump's apparent ability to

continue operating without incident or milker complaints), the causal link between Dairy No. 1's mastitis outbreak and DeLaval is stretched too thin.

4. Dr. Lee also uses an effective reserve measurement, obtained on one day in late April 2008, to argue that Schilder's mastitis outbreak is a function of DeLaval's equipment and/or maintenance efforts. But Schilder was experiencing an increase in mastitis before April 2008, prompting Dr. Lee's visits in November 2007 and December 2007. During these times in late 2007, effective reserve was never noted to be an issue. Because of this, Dr. Lee's low effective reserve measurements in April 2008, without more, is of limited utility because Schilder did not show it to exist at the same time that Dairy No. 1's milking system allegedly experienced unsafe vacuum fluctuations. Instead, the record could be interpreted to suggest that rising SCC levels in late 2007 and early 2008 existed for reasons independent of low effective reserve and may have even been attributable to unrelated events observed by Dr. Lee in his visits to Dairy No. 1 – e.g., buildup of milk solids in the recivers, excessive teat end hyperkeratosis, using potentially contaminated towels on multiple cows, and/or poor teat spray coverage. Simply put, Dr. Lee's interpretation of a lone data point at a single moment in time to explain the existence of conditions over a preceding, extended temporal span is compromised given the lack of additional data from which to draw, and ultimately support, the conclusion he reaches.

5. As acknowledged by Dr. Lee, there has been consistent evidence of the presence of Staph aureus in the bulk tank at Schilder since 2004. While the ultimate significance of this fact by is debatable, it cannot be considered in isolation.

Schilder's dairy operations were not immune to mastitis, having experienced high bulk tank SCC levels for extended periods of time before Dairy No. 1 was constructed in 2006.

Although SCC levels dropped to around 100,000 CPM after Dairy No. 1 was constructed in 2006, it is clear that elevated SCC levels at Schilder have existed independent of DeLaval's equipment and maintenance services. In other words, elevated SCC levels for extended periods did not first arrive at Schilder after DeLaval's equipment was installed; historically speaking, it was a repeat chapter.

Turning, then, to the abrupt rise in SCC levels in the Spring of 2008, the Court cannot ignore the fact that, in 2006, Schilder increased the size of its herd by 500-600 head. Of these new cows, approximately 300-400 were first calf heifers, while another 180 were milking cows. John Schilder testified that, while Schilder tested each of the first calf heifers for Staph aureus when "freshened," Schilder did not test the 180 milking cows for Staph aureus before being milked, relying instead upon the selling dairyman's monthly milk-testing results on all of the purchased cows.

To highlight such facts is not to lay blame upon Schilder for not testing the 180 individual milking cows for Staph aureus in 2006; rather, it is simply the fact, as emphasized by Dr. James Reynolds' testimony, that cows came into the herd at Schilder beginning in 2006 that carried Staph aureus for reasons that could not possibly be related to the DeLaval milking system. This, coupled with Dr. Reynolds' additional testimony that SCC levels generally lag behind findings of Staph aureus (and then correspondingly increase over a period of a year or more), combine to draw some correlation between the rate of increase in SCC levels at Dairy No. 1 in late 2007 and early 2008 with the increase in cow numbers from "outside" sources at Schilder in 2006.

The Court has considered Dr. Lee's testimony disputing the notion that the increase in cows at Schilder in 2006 contributed to high SCC levels at Dairy No. 1 in 2008. Nonetheless,

this evidence coalesces to support DeLaval's contention that the at-issue mastitis outbreak was more probably caused by something other than DeLaval's equipment, or the maintenance of the equipment. Such evidence includes the fact that lactating cows purchased in 2006 who were not cultured until the following freshening, could have brought additional mastitis infection to the herd, and could have been the source or some portion of the source for the new infections in the herd, at Dairy No. 1.

In assessing all of this evidence, and the conflicting inferences the parties would seek the Court to draw from such evidence, the Court has paid careful attention to the arguments of Schilder that, in essence, "all was well" at Dairy No. 1 until the SCC levels rose considerably in late 2007 and early 2008. Indeed, one conclusion that could be drawn from one view of the evidence is that, even if there had been additional Staph aureus brought into the herd from the large influx of new stock in 2006, whatever additional impact it had upon Dairy No. 1's overall SCC levels was not problematic, and that, when the SCC levels did turn problematic, the most immediate and telling problem – in Dr. Lee's view – was the operation of the DeLaval pump. However, as described earlier on in this decision, Dr. Lee's opinion in that regard was itself made in a vacuum. His ultimate opinion detours from any reference to the mastitis-fostering problems he found in other areas of the dairy operation in his reports, and his opinion is missing the sort of testing confirmation that could have been done to support – or rule out – his theory. Further, as noted previously, the subsequent operation of the pump after his April 2008 visit belies the particular problem that Dr. Lee opines must have existed over a lengthy period of time. In sum, although there is inferential evidence, combined with some limited empirical evidence, to support Dr. Lee's theory of how the mastitis outbreak arose, the other evidence in the record

serves to weaken and expose Dr. Lee's theory in a way that makes the theory lose the persuasive strength needed to carry the day for Schilder.

## IV.  CONCLUSIONS OF LAW[5]

The Court's jurisdiction in this action is based on diversity of citizenship.  Under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), "federal courts sitting in diversity jurisdiction apply state substantive law and federal procedural law."  *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996).  Therefore, Idaho's substantive law applies to Schilder's claims against DeLaval.

After reviewing the evidentiary record, considering the legal authorities submitted, and the argument made by the respective parties, the Court makes the following Conclusions of Law:

1.      Schilder originally asserted the following causes of action against DeLaval: (1) breach of express contract; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of the implied warranty of workmanlike performance; (4) breach of the implied warranty of merchantability; (5) breach of the implied warranty of fitness for a particular purpose; and (6) negligence.

2.      Schilder's claims against DeLaval do not stem from Schilder's October 2005 purchase of the milking system itself (a contract for goods); instead, Schilder's claims against DeLaval stem from its separate verbal contract with Schilder for the maintenance of the milking system, whereby DeLaval agreed to perform various monthly maintenance work on the milking system (a contract for services).

---

[5] To the extent any of the Conclusions of Law stated in this section can be considered Findings of Fact and are not already stated in section II, they are incorporated by reference into the relevant section above.

3.     Because claims for (1) breach of the implied warranty of merchantability and (2) breach of the implied warranty of fitness for a particular purpose apply to contracts for the sale of goods rather than services, they do not apply here and are therefore dismissed as Schilder fails to state and/or prove such a claim.[6]  However, even assuming that Schilder is asserting such claims against DeLaval, such claims are precluded by the terms, conditions, limitations, and exclusions contained in the "Limited Warranty" set forth on the reverse side of the October 2005 Purchase Agreement between John Schilder and DeLaval Direct.  Schilder offers no argument or evidence to the contrary.

4.     To prevail on its breach of contract claim, Schilder has the burden of proving each of the following propositions by a preponderance of evidence: (1) a contract existed between Schilder and DeLaval; (2) DeLaval breached the contract; (3) Schilder has been damaged on account of the breach; and (4) the amount of damages.

5.     Schilder proved that DeLaval entered into a verbal contract with Schilder for the maintenance of the milking system, whereby DeLaval agreed to perform monthly maintenance work on the milking system.

6.     Schilder proved that DeLaval breached one of its duties under its verbal contract with Schilder by failing to properly maintain the milking system, in particular, the flapper valves installed on both vacuum pumps.

7.     Damages for breach of contract are not recoverable unless it is established that they are the natural and proximate consequence of the breach and are not contingent or

---

[6]  In this regard, the Court recalls the narrowing of the claims made by Schilder's counsel at or before trial, and notes that Schilder's Proposed Findings of Fact and Conclusions of Law do not speak to either a claim for (1) breach of the implied warranty of merchantability or (2) breach of the implied warranty of fitness for a particular purpose.

speculative.  Schilder must prove damages with reasonable certainty – that is, evidence must be sufficient to support a reasonable inference of causation, allowing the factfinder to find that inference as more probable than an inference connecting the loss to other causes unrelated to DeLaval's conduct.

8.      Schilder failed to meet its burden of proving with reasonable certainty that DeLaval's breach of contract caused injury to Schilder.  The evidence is in conflict.  However, the Court is not persuaded that it is more probable that the cause of Schilder's claimed damages was the theory of causation advanced by Dr. Lee tied to the maintenance of the DeLaval milking equipment, rather than causes unrelated to DeLaval.  Therefore, Schilder's breach of contract claim against DeLaval cannot succeed.

9.      Schilder's claim for breach of the covenant of good faith and fair dealing against DeLaval also fails.  Because the covenant is implied in contract, it results in contract damages.  Schilder failed to prove its contractual damages arising from DeLaval's breach of contract.  The evidence is in conflict.  However, the Court is not persuaded that it is more probable that the cause of Schilder's claimed damages was the theory of causation advanced by Dr. Lee tied to the maintenance of the DeLaval milking equipment, rather than causes unrelated to DeLaval.  Therefore, Schilder's claim for breach of the covenant of good faith and fair dealing against DeLaval cannot succeed.

10.      Where a party provides personal services, a warranty is implied that the services will be performed in a workmanlike manner.  Because the warranty is implied in contract, it results in contract damages.  Schilder failed to prove its contractual damages arising from DeLaval's breach of contract.  The evidence is in conflict.  However, the Court is not persuaded that it is more probable that the cause of Schilder's claimed damages was the theory of causation

advanced by Dr. Lee tied to the maintenance of the DeLaval milking equipment, rather than causes unrelated to DeLaval. Therefore, Schilder's claim for breach of the implied warranty of workmanlike performance against DeLaval cannot succeed.

11.      To prevail on its negligence claim, Schilder has the burden of proving each of the following propositions by a preponderance of evidence: (1) a duty, recognized by law, requiring DeLaval to conform to a certain standard of conduct; (2) DeLaval's breach of that duty; (3) DeLaval's breach of that duty must have been the proximate cause of Schilder's injury; and (4) actual loss or damage.

12.      Schilder proved that DeLaval had a duty to perform various monthly maintenance work on the milking system.

13.      Schilder proved that DeLaval breached that duty by failing to properly maintain the milking system, in particular, the flapper valves installed on both vacuum pumps.

14.      Proximate cause includes cause-in-fact and legal responsibility. When two or more causes are possible, the "substantial factor test" applies and Schilder must prove by a preponderance of the evidence that DeLaval's conduct substantially contributed to its injury.

15.      The evidence is in conflict. However, the Court concludes that Schilder failed to meet its burden of demonstrating that DeLaval's breach of its duty to properly maintain the milking system was a substantial factor in causing Schilder's injury.

16.      Because Schilder did not prove that DeLaval's breach of contract and/or breach of its duty to properly maintain the milking system caused Schilder's injury, there is no need to address damages.

17.      DeLaval is entitled to judgment in its favor on all counts.

## V.  <u>ATTORNEYS' FEES</u>

If Defendant wishes to pursue an award of attorneys' fees, it must file an appropriate

motion and supporting brief in accordance with FRCP 54(d) and the corresponding Local Rule,

within the time allowed after entry of judgment in this action.

DATED:  **March 16, 2012**



Honorable Ronald E. Bush
U. S. Magistrate Judge